IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KENT A. LEHNEN,

                              Plaintiff,                              OPINION AND ORDER

        v.                                                                    23-cv-192-wmc

UNUM LIFE INSURANCE CO.,

                              Defendant.

---

        While defendant Unum Life Insurance Co. ("Unum") granted plaintiff Kent A.
Lehnen long-term disability benefits for a mental health condition on a limited basis from
April 2020 through July 2022, he filed this lawsuit claiming wrongful denial of additional
LTD benefits in violation of the Employee Retirement Income Security Act of 1974
("ERISA"), 29 U.S.C. § 1001 *et seq.*, based on physical disabilities that allegedly prevent
him from working.  (Dkt. #1.)  Unum argues that these benefits were properly denied and
filed a counterclaim against Lehnen to recover an alleged overpayment of benefits after he
was found physically disabled by the Social Security Administration ("SSA") and granted
Social Security Disability Insurance ("SSDI") benefits retroactive to April 2020.  (Dkt.
#11.)

        Pending before the court are the parties' cross-motions for judgment on the
administrative record under Federal Rule of Civil Procedure 52(a).  (Dkts. #16, #21.)  For
the reasons explained below, the court concludes that plaintiff Lehnen is entitled to
additional benefits dating back to July 2022 in light of overwhelming evidence of his
physical disabilities to perform material and substantial duties of his regular occupation as

a crisis manager for client's employees, but that Unum is also entitled to recover any overpayment that resulted from his receipt of SSDI benefits for those same disabilities.

"Congress enacted ERISA to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quoting 29 U.S.C. § 1001(b)).  To that end, ERISA's "comprehensive legislative scheme" includes "an integrated system of procedures for enforcement." *Id*. (internal quotation marks omitted).  In particular in this case, ERISA ultimately authorizes a participant or beneficiary to bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

When a participant challenges the administrative denial of benefits under a policy or benefit plan governed by ERISA, as here, the court begins by determining the appropriate standard of review.  Generally, a denial of ERISA benefits must be reviewed under a *de novo* standard unless the plan has given the plan administrator (or other fiduciary) the discretionary authority to determine eligibility for benefits and to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *accord Oye v. Hartford Life & Accident Ins. Co*., 140 F.4th 833, 836-37 (7th Cir. 2025).  Where the plan gives the plan administrator discretion to construe policy terms, and the decision to deny coverage is based on an interpretation of the plan, courts apply "an arbitrary and

capricious standard of review." *Sellers v. Zurich Amer. Ins. Co.*, 627 F.3d 627, 631 (7th Cir. 2010).

Here, it is undisputed by the parties that the benefit plan at issue does not grant discretionary authority to Unum as the plan's administrator. (Def. Response to Pl. Proposed Findings of Fact ("PFOF") (dkt. #30) ¶ 15.) Accordingly, the *de novo* standard of review applies to Lehnen's claim that he was wrongfully denied LTD benefits. *Sellers*, 627 F.3d at 631 ("Where either the plan grants no such discretion, or the denial of benefits determination is based on an interpretation of law, [courts] apply a *de novo* standard of review.").

Just as it sounds, under this standard, the court must make "an independent decision about the employee's entitlement to benefits," making its own decisions "on both the legal and factual issues that form the basis of the claim" without any deference to the plan administrator's decision. *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007). In other words, "[w]hat happened before the Plan administrator or ERISA fiduciary is irrelevant." *Id.* To prevail, therefore, Lehnen "bears the burden of proving not that the plan administrator erred, but that [he] is entitled to the benefits [he] seeks." *Dorris v. Unum Life Ins. Co. of Amer.*, 949 F.3d 297, 299 (7th Cir. 2020). More specifically, the plaintiff must prove by a preponderance of the evidence that he is entitled benefits under the terms of the plan.[1] *Krueger v. Reliance Standard Life Ins. Co.*, 772 F. Supp. 3d 893, 903 (N.D. Ill. 2025).

---

[1] Plaintiff Lehnen also asks the court to consider as part of its analysis a Regulatory Settlement Agreement ("RSA") involving Unum and various state departments of insurance as the result of a multi-state lawsuit involving its claims handling procedures. (Dkt. #15-7, at 31 (AR-001824).)

Here, both parties have moved for judgment on the administrative record under Federal Rule of Civil Procedure 52(a), which allows a district court "to resolve the dispute without a formal trial by making findings of fact and conclusions of law based on the administrative record." *Oye*, 140 F.4th at 836; *see also Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (Proceedings under Rule 52(a) in an ERISA case are "more akin to a bench trial than to a summary judgment ruling."). "This procedure is essentially a trial on the papers," and it "is well-suited to ERISA cases in which the court reviews a closed record." *Fontaine v. Metro. Life Ins. Co.*, 800 F.3d 883, 885 (7th Cir. 2015) (internal citation omitted). Under Rule 52(a), this court must "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). Because of the voluminous medical evidence in the administrative record, the court devotes a substantial portion of this Opinion to outlining those facts, before addressing the current procedural posture and conclusions of law.

---

Under the RSA, Unum must give "significant weight" to opinions by an attending physician and awards of disability benefits by the SSA. (Dkt. #15-5, at 286 (AR-001503); Dkt. #15-7, at 14 (AR-001807).) Under *de novo* review, however, Unum argues that the RSA is legally irrelevant because the court independently determines whether Lehnen satisfies the Plan's coverage requirements without regard for either Unum's initial decision or its claims procedures. (Def. Response to Pl. Findings (dkt. #30) ¶¶ 16-27.) Because review is *de novo*, the court agrees that the RSA is not relevant here, although it would be if the arbitrary and capricious standard applied. *See Freeland v. Unum Life Ins. Co. of Amer.*, No. 11-cv-053-wmc, 2013 WL 4482995, at *2 (W.D. Wis. Aug. 19, 2013) (discussing Unum's duties under the RSA in an ERISA case decided under an "arbitrary and capricious" or "abuse of discretion" standard where the benefit plan gave the administrator discretion over benefits decisions).

FINDINGS OF FACT[2]

**A. Lehnen's Employment and Medical History**

Lehnen is a resident of Hudson, Wisconsin.  He began working for Beacon Health Options in 2011.  Beacon provides Employee Assistance Program ("EAP") services, including crisis intervention or crisis management to its clients and their employees.  (Pl. Compl. (dkt. #1) ¶ 17.)  As "Senior Account Executive" for Beacon, Lehnen worked exclusively from home.  (*Id*. at ¶¶ 18, 20.)  His client base consisted of Fortune 50/100/500 companies, school districts, police departments, and clergy.  (*Id*. at ¶ 17.)  He also managed other account executives.  (*Id*. at ¶ 20.)  Accordingly, Lehnen reportedly spent most of his usual 10-12 hour workday on his computer, responding to emails, dealing with real-time crisis events, preparing and reviewing reports, negotiating and writing contracts, creating marketing materials, working with spreadsheets and databases, updating budgets, hiring, seeking and reviewing resumes, preparing payroll, and invoicing.  (*Id*. at ¶¶ 18-19; AR-003140.)

Lehnen also worked on matters nationally and internationally, sometimes responding to suicides and other casualties, often at a moment's notice, still with most of his work being performed via computer.  (Dkt. #15-5, at 138 (AR-001355).)  Some of the more notorious crisis to which he was asked to respond for clients included mass shootings

---

[2] The court has attempted to take the facts in this section from the parties' proposed findings to the extent that they are supported by evidence in the administrative record.  With the exception of the facts concerning Unum's counterclaim, the parties dispute most of the proposed findings. Because of this, the court has included evidentiary support to Bates Number cites in the administrative record ("AR"), which is located at Dkt. #15-1 through #15-11, when addressing Lehnen's claim for disability benefits.

occurring in Las Vegas and at Sandy Hook Elementary, a night club in Florida, and a mall in Kenya.  (*Id.*)  Lehnen also responded to natural disasters, such as the California wild fires.  (*Id.*)  When these tragedies occurred, Lehnen organized all of the psychological response providers to mobilize and coordinate with clients who had impacted employees. (*Id.*)  In addition to crises intervention and management, Lehnen frequently prepared reports and negotiated contracts, both with clients and with mental health providers.  (*Id.*)

In 2015, when he was 54 years of age, Lehnen took a leave of absence from Beacon after reporting persistent postural perceptual dizziness ("PPPD"), anxiety, depression, and attention deficit disorder ("ADD").  PPPD is also sometimes referred to as "3PD," and can be "a common long-lasting cause of dizziness or vertigo."  (Tataryn Decl. Ex. 2 (dkt. #19-2) at 2.)  Also described as a "chronic vestibular disorder," symptoms of PPPD include "unsteadiness, dizziness, or non-vertiginous dizziness, which are present for most days for 90 days or more and exacerbated by positions such as sitting upright, standing, or walking and visually complex stimuli."  (*Id.*; Tataryn Decl. Ex. 1 (dkt. #19-1) at 6.)

While Lehnen was eventually able to return to work with accommodations in the form of additional computer screens (3-4) to reduce scrolling (dkt. #15-1, at 173 (AR-000172)), his health deteriorated again in the Spring of 2019, when he experienced bouts of dizziness, sleeping difficulties, neck pain, hand pain, and anxiety about his job performance.  (Dkt. #15-1, at 186 (AR-000185); Dkt. #15-5, at 138 (AR-001355).)  In response, Lehnen reduced his hours between July 7, 2019, and November 17, 2019, but then returned to work full time.  (Dkt. #15-1, at 186 (AR-000185).)  Unfortunately, within a few months, Lehnen was forced to stop working altogether because of

deteriorating physical and mental health conditions that made it difficult for him to work on a computer. In particular, extensive scrolling on his computer exacerbated his PPPD symptoms and the amount of typing he performed aggravated his bilateral hand pain.

Accordingly, Lehnen was placed on medical leave on April 16, 2020 (dkt. #15-1, at 46 (AR-000045)), reporting dizziness and nausea from PPPD, as well as anxiety and depression from being debilitated due to "vision issues." (Dkt. #15-1, at 173 (AR-000172).) He also reported having heart issues, high blood pressure from anxiety, "very swollen and stiff" fingers, as well as joint pain. (*Id.* at 172, 175 (AR-000172, 174).) Based on these symptoms, Lehnen first submitted an application for long-term disability ("LTD") benefits on April 28, 2020 (Claim #17913950), listing Dr. James McCoy as his treating psychiatrist and Dr. Scott Eggers of the Mayo Clinic as his treating neurologist. (Dkt. #15-1, at 46-47 (AR-000045-46).)

### B. The LTD Benefit Plan

As part of its employee benefit package, Beacon provided Lehnen and others with long-term disability insurance coverage under a group policy insured by Unum -- Policy No. 413774 001. Beacon's parent, FHC Health Systems, Inc., is the policyholder, and Unum is the claims administrator and fiduciary for its employee welfare benefit plan (the "Plan"). There is no dispute that the Plan is subject to ERISA.

As a "Group 2" participant in the Plan administered by Unum, Lehnen is considered "disabled" when Unum determines that:

- you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and

- you have a 20% or more loss in your **indexed monthly earnings** due to
the same sickness or injury.

(Dkt. #15-1, at 84 (AR-000083) (emphasis in original).)  "Limited" is defined by the Plan

to mean "cannot or unable to do" (*id*. at 101 (AR-000100)), while "material and

substantial duties" are those that (1) "are normally required for the performance of [the

claimant's] regular occupation"; and (2) "cannot be reasonably omitted or modified." (*Id*.

at 102 (AR-000101).)  A claimant's "regular occupation" is further defined to mean the

occupation that the claimant is "routinely performing" at the time disability begins,

although "Unum will look at [the claimant's] occupation as it is normally performed in the

national economy, instead of how the work tasks are performed for a specific employer or

at a specific location." (*Id*. at 103 (AR-000102).)

For employees such as Lehnen, who had not yet reached the age of 60 at the time

he claimed disability, the "maximum period of payment" for benefits extended to age 65,

but not less than five years.  (Dkt. #15-1, at 90 (AR-0000089).)  However, the Plan also

states that a "lifetime cumulative maximum benefit period" of only *24 months* applies "for

all disabilities due to **mental illness** and disabilities based primarily on **self-reported**

**symptoms**," including "any combination of such disabilities," even if they "are not

related." (*Id*. at 91 (AR-000090) (emphasis in original).)  "Self-reported symptoms" are

also defined to mean "the manifestations of [the claimant's] condition which [he or she]

tell[s] [their] physician, that are not verifiable using tests, procedures or clinical

examinations standardly accepted in the practice of medicine." (*Id*. at 103 (AR-000102).)

"Examples of self-reported symptoms include, but are not limited to, headaches, pain,

fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy." (*Id*.)

8

**C. Lehnen's Claim for Benefits**

In support of his claim for benefits, Lehnen provided an "Attending Physician Statement" from Dr. McCoy, who identified "dysthymic disorder" as his primary diagnosis, with a secondary diagnosis of "generalized anxiety disorder" and ADD.  (Dkt. #15-1, at 60-62 (AR-000059-61).)  Dr. McCoy specifically opined that Lehnen's symptoms impaired his judgment, decision making, and concentration, which limited his ability to perform his job duties.  (*Id*. at 61 (AR-000060).)  Dr. McCoy also executed a "Certification of Health Care Provider for Employee's Serious Health Condition" form, repeating that Lehnen's "depression + anxiety impairs his judgment & decision making," such that he was "fully unable" to perform his work.  (*Id*. at 127 (AR-000126).)  Dr. McCoy provided additional records regarding Lehnen's therapy sessions and medication regimen.  (Dkt. #15-2, at 36-53 (AR-000335-352).)

Lehnen also submitted medical records from another treating physician, Dr. Mark Roberts, indicating that Lehnen was prescribed medication for cervical arthritis and hand stiffness due to arthritis, as well as chronic restless leg syndrome ("RLS").  (Dkt. #15-1, at 290-91 (AR-000289-290).)  While an MRI of Lehnen's right hand was unremarkable (*id*. at 301 (AR-000300)), additional records documented that Lehnen was also treated for moderate hypertension.  (Dkt. #15-2, at 102-03 (AR-000401-02).)

Finally, Lehnen provided records from evaluations done in September 2020 by specialists at the Mayo Clinic in Rochester, Minnesota, including Drs. Eggers and Shirlene Sampson.  (Dkt. #15-2, at 166-97 (AR-000465-496).)  At that time, Lehnen reported experiencing dizziness related to "scrolling on a phone or on a computer," but not with his

9

own movement.  (*Id*. at 171 (AR-000470).)  He further reported that his "work situation" was "extremely stressful as he has a lot of computer activity in his job," and he had begun to struggle with forgetfulness with some "word-finding difficulties."  (*Id*.)  Dr. Sampson addressed Lehnen's symptoms and assessed him with "Cognitive disorder, NOS."  (*Id*. at 172 (AR-000471).)  While an MRI of Lehnen's brain disclosed "[n]o acute intracranial abnormalities" (*id*. at 166 (AR-000465)), Dr. Sampson noted that Lehnen scored a 21/30 on the Montreal Cognitive Assessment ("MOCA") (*id*.), which is within the range of "mild cognitive impairment."  (Dkt. #17, at 9 n.4.)  Dr. Sampson also determined that Lehnen had "reduced short-term memory, getting only 1 of 5 items at a 5 minute delay," although he had "good concentration" and performed well on "serial sevens."  (Dkt. #15-2, at 172 (AR-000471).)  Dr. Sampson ordered neuropsychological testing and another MRI of Lehnen's brain "to get [a] quantitative evaluation of his hippocampi."  (*Id*.)

Dr. Eggers further noted that Lehnen had previously been prescribed a home program of physical therapy for his vestibular symptoms and PPPD.  (*Id*. at 176 (AR-000475).)  During his evaluation at Mayo Clinic, Lehnen also saw a physical therapist (P.T. Jay Goetting), who observed that Lehnen's balance was "improved" since first being diagnosed with PPPD, but that he continued to have "visual sensitivities" and reported having "neck pain" as well.  (*Id*. at 174 (AR-000473).)  Even so, Dr. Eggars observed "no objective indications of either peripheral or central vestibular system dysfunction" and "no indications of active benign paroxysmal positional vertigo (BPPV)" during diagnostic testing.  (*Id*.)  Still, Dr. Eggers observed that Lehnen's symptoms suggested "the possibility of developing headache-associated dizziness and/or persistent postural perceptual

dizziness," and he also noted that other test results indicated a "high likelihood of clinically significant depressive and anxiety symptoms." (*Id*. at 177 (AR-000476).)

Thus, while Dr. Eggers did not identify any "symptoms or new exam findings that would be worrisome for some additional vestibular or neurological disorder," he deferred to Lehnen's treating psychiatrist, Dr. McCoy, for ongoing management of anxiety and depression, *and* recommended "Habituation-type vestibular rehabilitation" as a "primary therapeutic option" for treating Lehnen's symptoms of PPPD. (*Id*. at 182-84 (AR-000481-483.) These exercises involve watching a series of videos at 30-40 second intervals, twice daily, progressing from videos that are easier to watch to those that are more difficult with a goal of 15 minutes without symptoms. (*Id*. at 183 (AR-000482).). Dr. Eggers also recommended that Lehnen "should primarily limit his computer use to those exercises while he is not working." (*Id*.)

In support of his claim for LTD benefits, Lehnen also completed a questionnaire about his work experience and education,[3] and provided a "Job Description" for his title as a Senior Account Executive at Beacon, which included the following:

> General Summary – Develops a strategic approach to the management, business retention and growth of corporate accounts, specifically around large Beacon Health Options business critical accounts and new business development. Functions in a leadership role within Account Services, the Senior Account Executive will assume management responsibilities that

---

[3] Before going to work at Beacon in 2011, Lehnen worked for Northwest Airlines for 20 years, and he also worked in real estate. (Dkt. #15-1, at 178 (AR-000177).) Lehnen attended Minneapolis Community College and the University of Minnesota before receiving a Bachelor of Science in Business Administration from Madison University in 2006. (Dkt. #15-5, at 131 (AR-0001348).) He received his Certified Employee Assistance Professional credentials in 1992, and earned a global EAP certification through the University of Maryland, and is further certified in Critical Incident Stress Management. (*Id*.)

include participation in corporate initiatives, coordination of activities in response to executive management request or to enhance provision of services and providing subject matter expertise to facilitate interdepartmental cooperation.  Primary areas of accountability include business retention, new business development and demonstrated excellence in customer satisfaction and staff management of less experienced account staff as assigned.

(Dkt. #15-2, at 84 (AR-000383).)[4]   Lehnen's position also required "[e]xpert and proficient level of knowledge, skill and ability" with Microsoft Office products, including Word, Excel, and PowerPoint.  (*Id*. at 87 (AR-000386).)  Moreover, in addition to knowledge and experience related to "clinical services," the position required the same level of expert proficiency with:  (1) analytical problem solving ability; (2) interpersonal communication skills; (3) verbal and written communication skills; (4) group presentation and public speaking skills; and (5) a team-oriented work philosophy.  (*Id*.)

After considering the documents provided, Unum's vocational consultant, Laura Feeney, concluded that when compared to occupations in the national economy Lehnen's duties most closely matched the duties performed by an "Account Executive eDOT code 169.367-001, which involves promoting company services or products to individuals or businesses, selling individually or as the head of a team."  (Dkt. #15-2, at 89 (AR-000388).)  Feeney identified the following "Material and Substantial Duties" for this position:

Maintains existing customer accounts, acknowledges and handles taking care of their needs, and assures their satisfaction.  Helps maintain or extend existing customer accounts, and attracts and develops new accounts. Communicates regularly with current and potential customers over the

---

[4] Unum disputes that Lehnen's job title was Senior Account Executive, representing that it received conflicting information about his title, but offering no evidence of his having a *different* job title despite being in the best position to do so.  (Def. FOF (dkt. #22) ¶¶ 17-26; Def. Response to PFOF (dkt. #30) ¶ 62) (citing AR-000184-186, 1307-1311).

phone or email to discover their needs, answer questions, respond to emails, and find solutions to issues. Ensures products and services are to customers' satisfaction. Updates customers' profiles so the company can track what's happening with accounts. Gathers information and submit[s] reports to management. Networks within the industry and studies the competition. Prepares and delivers targeted presentations of the company's products or services in person and/or web-based, explains product offerings, writes up bids, and closes sales.

(*Id*.) Feeney further determined that the occupation required sedentary work with the following physical demands:

Performed mostly sitting, may involve standing or walking for brief periods of time and lifting, carrying, pushing, and/or pulling up to 10 pounds occasionally[.] Frequent talking, hearing, near acuity, far acuity[.] Occasional reaching, handling, fingering, [and] keyboard use.

(*Id*. at 90 (AR-000389).) Finally, Feeney determined that the mental or cognitive demands of the occupation required "skilled work" that involved: "directing and controlling activities; using creativity to develop innovative responses to customer needs; speaking and writing persuasively to influence choices; making independent judgments and decisions; and interacting professionally in the workplace." (*Id*.)

On October 20, 2020, Unum submitted Lehnen's claim for approval, noting that he was receiving treatment from "multiple specialists" and had been given behavioral health restrictions. (Dkt. #15-2, at 206 (AR-000505).) Specifically, Unum noted that while Lehnen's medical records from neurology reflected a normal MRI of the brain and a "MOCA of 21" that indicated mild cognitive impairment, the information in the file supported a finding that Lehnen would be precluded from the outlined activities listed by Unum's vocational consultant Feeney, at least through neuropsychological or "NP testing"

to further evaluate Lehnen's cognitive impairment, at which time his eligibility for benefits would be re-evaluated.  (*Id*.)

In preliminarily approving Lehnen's claim, Unum noted that he had been out of work since April 2020 due to dysthymic and generalized anxiety disorders.  (Dkt. #15-2, at 232 (AR-000531).)  Because his disabling conditions concerned behavioral or mental health, however, Unum also determined that the maximum duration of benefits Lehnen could receive was 24 months.  (*Id*.)  Accordingly, Unum notified Lehnen that his claim for LTD benefits was approved in a letter dated October 26, 2020, explaining that his date of disability was April 20, 2020, and that his benefits would begin as of July 19, 2020.  (Dkt. #15-2, at 241 (AR-000540).)  The letter advised Lehnen that he was also required to give Unum authorization to obtain additional medical information as proof of his claim or of continuing disability.  (*Id*. at 244 (AR-000543).)  Unum further advised Lehnen that the maximum benefit period for his claim was 24 months.  (*Id*.)  In a separate follow-up letter to Lehnen, Unum clarified that, as long as he remained disabled, he would be eligible to receive benefits through July 18, 2022.  (Dkt. #15-3, at 37 (AR-000642).)

### D. Unum Terminates Plaintiff's Benefits

Approximately ten months later, however, Unum sent another letter to Lehnen on August 20, 2021, seeking additional medical records from a recent visit with Dr. McCoy, as well as records from a therapist that Lehnen was then seeing at MN Psychological Association, Jennie Hardman.  (Dkt. #15-3, at 293 (AR-000897).)  Unum also reminded Lehnen of the Plan's 24-month limitation on benefits for disability based on mental illness:

> Your policy has a limitation for mental illness conditions. The medical information in our file indicates that your disability is subject to this policy limitation. Based on the information we have on file, you are limited to a maximum of 24 months of benefits.
>
> Your benefits started on July 19, 2020. You will reach the maximum duration of your benefits on July 18, 2022, provided you continue to meet the policy definition of disability.

(*Id.*) In response, Lehnen advised Unum that he could not go back to his position because of pain in his neck, his hands, symptoms of PPPD, and the cognitive difficulties that he was experiencing. (Dkt. #15-4, at 90 (AR-000998).)

Dr. McCoy provided additional records of Lehnen's treatment for his dysthymic disorder, attention deficit hyperactivity disorder ("ADHD"), and chronic post-traumatic stress disorder ("PTSD") with associated nightmares. (Dkt. #15-4, at 47-49 (AR-000955-957).) Dr. McCoy also responded to a questionnaire from Unum medical consultant Lawrence Burstein, who asked whether Lehnen remained unable to work based on his mental status, which Burstein thought was unsupported by findings that Lehnen could not perform the occupational demands of his work. (Dkt. #15-4, at 264-65 (AR-001172-1173).) Dr. McCoy disagreed and indicated that although Lehnen was initially thought to be impaired by his behavioral health symptoms, he was now of the opinion that Lehnen was impaired by his medical condition and physical impairments, referring in particular to additional medical records from Lehnen's treatment providers at Mayo Clinic. (*Id.* at 271 (AR-001179).)

Although Unum had also requested records from therapist Jennie Hardman to support Lehnen's claim of cognitive impairment (dkt. #15-4, at 243 (AR-001151)), Hardman did not provide any records other than a treatment plan, while responding that

Lehnen had a psychiatric diagnosis of PTSD that caused the following, moderately severe impairments: hypervigilance, high startle response, sleep disturbances and nightmares, avoidance of triggers, fear, and worry. (*Id*. at 257, 261 (AR-001165, AR-001169).) Hardman also advised that Lehnen did not appear to have restrictions or limitations with work due to PTSD, only due to PPPD. (*Id*. at 258 (AR-001166).) Specifically, Hardman opined that Lehnen must limit computer work to 15 minutes per day, could not scroll on his computer, and had limited ability to grab, type, or sit for long periods. (*Id*.)

Unum's medical consultant Burstein also noted that Lehnen had a comprehensive evaluation and neuropsychological examination at the Mayo Clinic in November 2021, which disclosed areas of weakness in motor processing speed, although the neurologist who saw him indicated that Lehnen did not meet the criteria for mild cognitive impairment. (*Id*. at 271 (AR-001179).) After considering the records from Dr. McCoy and therapist Hardman, Burstein concluded that "within a reasonable degree of medical certainty, the information does not support that the claimant continues to lack the full-time sustained capacity to perform the listed occupational demands from a behavioral health perspective." (*Id*. at 271-72 (AR-001179-1180).)

Unum's Designated Medical Officer, Audrey Longson, psychiatry D.O., concurred with Burstein, concluding the available medical information did not support finding that Lehnen continued to lack the sustained capacity to perform full-time work involving "directing and controlling activities; using creativity to develop innovative responses to customer needs; speaking and writing persuasively to influence choices; making independent judgments and decisions; and interacting professionally in the workplace."

(Dkt. #15-4, at 284-85 (AR-001192-1193).)  Dr. Longson also found the formal testing of Lehnen's cognitive functioning at Mayo Clinic "largely unremarkable."  (*Id*. at 284 (AR-001192).)  Indeed, Longson found the medical records as a whole contained "serial unremarkable mental status examination findings" and did not contain "clinical evidence of severe/persistent psychiatric pathology that would be expected to restrict or limit functionality."  (*Id*. at 285 (AR-001193).)

On February 3, 2022, Unum informed Lehen in writing that it had completed a review of his LTD claim and would not continue paying benefits through the maximum duration allowed under the Plan:

> Based on our review of the available medical information, we determined that your mental health conditions no longer rise to a level of severity which would prevent you from performing the demands of your regular occupation on a full-time basis.  We determined that you[r] conditions of [PPPD], reports of cognitive decline, neck and hand pain would not prevent you from performing the demands of your regular occupation.
>
> Based on our review, the information in your claim file indicates you are not precluded from performing the duties of your regular occupation due to any conditions/symptoms. You no longer meet your policy's definition of disability.  Your claim has been closed effective February 4, 2022.

(Dkt. #15-4, at 303 (AR-001214).)  In reaching the decision that Lehnen was no longer disabled under the terms of the Plan, Unum considered evaluations by physicians at Mayo Clinic, as well as those by Dr. McCoy and therapist Hardman.  (Dkt. #15-4, at 298-99 (AR-001206-1207); (*Id*. at 303-04 (AR-001211-1212).)

### E.  Plaintiff's Appeal

On July 28, 2022, Lehnen submitted an appeal and additional supporting evidence to Unum.  (Dkt. #15-5, at 70-89 (AR-001287-1306.)  Then almost 61 years old, Lehnen

argued that he continued to be disabled under the terms of the Plan based on the following, multifold conditions:

> (1) [PPPD]; (2) cognitive impairment and suspected early onset [Lewy Body] dementia;[5] (3) sleep disorders including [Rapid Eye Movement ("REM") sleep behavior disorder ("RBD")], [Restless Leg Syndrome ("RLS"), and [Obstructive Sleep Apnea ("OSA")]; (4) substantial degenerative joint disease and advanced degenerative arthritis in his neck and spine; (5) carpal tunnel syndrome bilateral, dupuytrens,[6] and degenerative arthritis in both hands and wrists and bilateral ulnar positive variance; and (6) behavioral issues involving anxiety, PTSD and depression.

(*Id.* at 70 (AR-001287).)  Lehnen argued that Unum's decision disregarded these documented physical conditions and medical records from treating physicians, and was further based on a "flawed vocational assessment."  (*Id.* at 71 (AR-001288).)  Specifically, Lehnen noted that:  (1) Unum incorrectly determined that his regular occupation was an Account Executive, when his actual job title was Senior Account Executive; and (2) the vocational expert further incorrectly determined that his job only entailed occasional keyboarding, when in fact his work required constant computer usage.  (*Id.* at 85 (AR-001302).)

On appeal, Lehnen also provided a detailed summary of his claim history, including the incorrect job description used by Unum's vocational consultant Laura Feeney, and medical reviews by Unum that disregarded symptoms and diagnoses from several treating

---

[5] Lewy Body Dementia is a type of dementia with similarities to Parkinson's disease and Alzheimer's disease, with decreased verbal fluency and visual-spatial awareness.  Dorland's Illustrated Medical Dictionary 479 (33rd ed. 2020).

[6] Dupuytren's contractures are a condition of fixed resistance to passive stretch of a muscle in the hand, usually consisting of flexion of a finger caused by shortening, thickening, and fibrosis of the palmar fascia.  Dorland's Illustrated Medical Dictionary 404 (33rd ed. 2020).

medical specialists opining on his physical condition, particularly on the difficulties caused from PPPD, cognitive impairments, carpal tunnel syndrome, and advanced degenerative arthritis.  (*Id*. at 74-86 (AR-001291-1303).)  Lehnen also presented new evidence in the form of an "ADA Accommodation Form" completed by Dr. Wayne Feyereisn of the Mayo Clinic, explaining that the functional limitations caused by Lehnen's disability included the inability to perform the minimum required number of hours, both physically and mentally, at the executive level, especially the demands of using a computer due to multiple complications from PPPD, cognitive decline, degenerative disc disease, arthritis in his neck and hands, carpal tunnel, sleep disorders, anxiety, and depression.  (*Id*. at 86-87 (AR-001303-1304).)  In addition, Lehnen provided updated support from Dr. McCoy, as well as further support from orthopedic surgeon, Dr. Mary Jurrison, of the Mayo Clinic, and an independent vocational expert, Ken Askew, the latter of whom concluded that Lehnen was not physically or mentally capable of working in his regular occupation and was disabled. (*Id*. at 87-89 (AR-001304-1306).)

Finally, before Unum decided Lehnen's appeal, the SSA found him disabled due to an inability to work and awarded him SSDI benefits.  Specifically, in parallel with submitting his claim to Unum, Lehnen had filed a claim for SSDI benefits on December 24, 2020, claiming an inability to work as of April 20, 2020, based on the following physical and mental conditions:  PPPD, degenerative disc disease, severe depression, severe anxiety, and arthritis in both hands.  (Dkt. #15-7, at 99 (AR-001892).)  To qualify for SSDI benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to

19

last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). This impairment must also render the claimant unable to engage in the work previously performed *or* in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

In a decision dated September 15, 2022,[7] the SSA determined that Lehnen was primarily disabled due to "Disorders of the Skeletal Spine" and that his mental disorders were secondary. (Dkt. #15-7, at 97 (AR-001890).) The SSA concluded further that Lehnen had the following other "severe" physical conditions: Abnormality of a Major Joint(s) in Any Extremity, Carpal Tunnel Syndrome, Vertiginous Syndromes and Other Disorders of Vestibular System. (*Id*. at 107 (AR-001900).) The SSA determined that Lehnen had the following physical residual functional capacity limitations:

- Occasional lifting of 20 pounds and frequent lifting of 10 pounds.

- Standing, walking, or sitting for no more than 6 hours in an 8-hour workday.

- Limited ability to push or pull in both upper extremities.

- Postural limitations on climbing ramps/stairs (frequently), ladders/ropes/scaffolds (never); balancing (frequently); stooping (frequently); kneeling (frequently); crouching (frequently); crawling (occasionally).

- Limited reaching in any direction, including overhead or bilaterally on the left and right.

- Limited handling (gross manipulation) and fingering (fine manipulation) in both hands.

---

[7] Lehnen's claim was denied at the initial level on August 19, 2021, but he was subsequently found disabled on reconsideration. (Dkt. #15-7, at 115 (AR-001908).)

(*Id*. at 111-115 (AR-001904-1908).)  The SSA also determined that Lehen was moderately limited in his ability to maintain attention and concentration for extended periods.  (*Id*. at 116 (AR-001909).)

Given these limitations, the SSA concluded that Lehnen had maximum sustained work capability for light, semi-skilled work, that was limited to simple tasks.  (*Id*. at 121-22 (AR-001914-1915).)   The SSA also concluded that Lehnen was disabled from the alleged onset date of April 20, 2020, because:  (1) he did not have the residual functional capacity to perform his past relevant work as a Senior Account Executive, whose duties include managing workplace EAP programs, writing and providing reports, conducting trainings and managing financial budgets; and (2) he did not have transferable skills.  (*Id*. at 120-22 (AR-001913-1915).)

### F.  Unum's Decision on Appeal

Lehnen provided the complete SSA file to Unum on November 9, 2022.  (Dkt. #15-7, at 86-89 (AR-001879-1882).)  Subsequently, in a decision issued on January 4, 2023, Unum sustained his appeal, but only in part, concluding that Lehnen was disabled due to mental health conditions and was entitled to continue receiving LTD benefits from February 4, 2022, through July 18, 2022, finding that the 24-month mental health limitation in the Plan applied to Lehnen's disability.  (Dkt. #15-11, at 263-264 (AR-003269-3270).)  However, despite the SSA's decision that he was physically disabled and could not work, Unum determined that his residual functional capacity did not exceed the physical demands of his regular occupation.  (Dkt. #15-11, at 263 (AR-003269).)  Specifically, Unum found that the medical records did not support restrictions that

precluded "occasional keyboard use" or limited his ability to otherwise perform his work. (Dkt.#15-11, at 264 (AR-003270).)   Accordingly, Unum denied Lehnen additional disability benefits under the Plan based on any of his limitations.  (*Id*.)

As support for this decision, Unum relied on an assessment by its medical consultant, Dr. Scott B. Norris, who had never met Lehnen, but concluded from the medical evidence that Lehnen was capable of performing the demands of his sedentary level occupation as of July 19, 2022, and going forward.   (Dkt. #15-6, at 48 (AR0001567).)  Unum also relied on an assessment by psychiatric consultant Dr. Peter Brown, who had similarly never met Lehnen, but observed that there was evidence of a "chronic psychiatric condition with symptoms of inattentiveness, anxiety and depression exacerbated by work stressors around the date of disability."  (Dkt. #15-6, at 95 (AR-001614).)  Dr. Brown also found it important that the initial supporting behavioral health restrictions and limitations had predominantly changed to general medical explanations for Lehnen's work impairments in 2022.  (*Id*.)   Noting further that neuropsychological testing in late 2021 was normal and not consistent with a physical impairment due to any diagnosis or combination of diagnoses, Dr. Brown concluded that there was no support for restrictions or limitations after February 3, 2022.  (*Id*.)

PROCEDURAL POSTURE

As a result of Unum's decision that he was not physically disabled, Lehnen's LTD benefits based on his mental or behavioral health expired at the end of the 24-month period allowed under the Plan on July 18, 2022, prompting Lehnen to file this lawsuit to challenge Unum's adverse decision regarding his entitlement to LTD benefits beyond that date based

on his physical impairments.  (Pl's Compl. (dkt. #1) ¶ 116.)  The administrative record is voluminous.  The medical records, as well as the opinions from treating physicians and a vocational expert about Lehnen's functional capacity and restrictions, are discussed further below as additional findings of fact in connection with the merits of his claim.  Arguing that he meets the definition of disability under the Plan and is entitled to continuing LTD benefits beyond July 18, 2022, Lehnen seeks an adjudication that he is physically disabled and entitled to monthly benefits retroactive to the date benefits were terminated, plus prejudgment interest, as well as attorneys' fees and costs under 29 U.S.C. § 1132(g).

Unum has also filed a counterclaim (dkt. #11, at 40-45), arguing that Lehnen is required to refund an overpayment of LTD benefits under the Plan for the SSDI benefits he received retroactive to April 2020.[8]  The Plan authorizes Unum to subtract from Lehnen's "gross disability payment" funds that are "deductible sources of income," including any amount received as disability benefits under "the United States Social Security Act."  The Plan provides further that Unum has the right to recover in full any overpayment due to receipt of deductible sources of income.  The Plan states:  "Unum, for itself and as claims fiduciary for the Plan, is entitled to legal and equitable relief to enforce its right to recover any benefit overpayments caused by [a participant's] receipt of disability earnings or deductible sources of income from a third party."  As a result, the Plan recognizes that "Unum and the Plan have an equitable lien over such sources of income until any benefit overpayments have been recovered in full."

---

[8] The facts relevant to Unum's counterclaim discussed in this section are undisputed.  (Pl. Amended Response to Unum's Findings (dkt. #31) ¶¶ 162-177.)

On July 31, 2020, Unum sent Lehnen a letter advising him that any LTD benefits he received under the Plan may be reduced if he applied for and received income benefits from another source. The letter included a "Benefit Payment Option Agreement," which Lehnen signed on August 17, 2020. (Dkt. #11-1, at 1.) In doing so, Lehnen elected to have Unum calculate his benefits *without* estimating the benefit amounts that he could potentially receive from other sources, such as Social Security. (*Id.*) Lehnen acknowledged that "by paying [him] an unreduced benefit at this time, an overpayment will likely be incurred on [his] disability claim that [he] will have to repay in the future." (*Id.*) Lehnen agreed to repay Unum "within 30 days of the receipt of the funds creating the overpayment." (*Id.*) Lehnen also agreed that, if he did not repay the entire overpayment within 30 days, Unum may:

1. Recoup the overpayment from future disability payments, including any minimum benefit owed under the policy;

2. Effect trustee process, lien, attachment or garnishment on any of [his] real or personal property in an amount equal to the overpayment;

3. Commence a civil action against [him] to enjoin [his] act of violating the terms of the Plan by failing to reimburse Unum the full amount of the overpayment;

4. Seek a judgment of specific performance requiring [him] to abide by [his] promise to repay the overpayment;

5. Seek all other appropriate equitable relief including equitable restitution, money had and received, and an equitable lien by agreement; and/or

6. Seek all fees and expenses, including reasonable attorney's fees, associated with the collection of the overpayment.

(*Id.*)  Finally, Lehnen agreed to "waive any legal or equitable defenses to the rights of Unum to enforce the terms of this Agreement."  (*Id.*)

When Unum approved Lehnen's claim for LTD benefits in 2020, they contacted him about applying for SSDI benefits and referred him to their Social Security assistance provider, GENEX Services, LLC, which represented Lehnen during that application process.  (Dkt. #15-3, at 5-6 (AR-000610-611).)   At some point thereafter, Lehnen retained his own private counsel for the purpose of pursuing SSDI benefits.  While Lehnen was in the process of applying for SSDI benefits, Unum sent him another letter on November 11, 2020, advising again of his responsibility to reimburse any overpayment under the terms of the Plan:

> **Social Security Benefits and Reimbursement Responsibility**
>
> If you are approved for Social Security Disability Insurance benefits, your Long Term Disability payments will be reduced by your Social Security benefits.  If you are awarded Social Security benefits, your first payment from this alternate source will generally be a lump sum of retroactive benefits.
>
> Please be aware that all or a portion of this retroactive payment may need to be repaid to Unum Life Insurance Company of America.   Therefore, we recommend that you not spend this income before contacting your Unum Life Insurance Company of America representative.
>
> After receipt of an award, Unum Life Insurance Company of America may offset or reduce the amount of your Long Term Disability monthly benefit by all or some of that other income benefit.
>
> Please notify us immediately of any award notice of Social Security Disability Insurance benefits.

(Dkt. #15-3, at 6 (AR-000611).)

In October 2022, Lehnen received SSDI benefits retroactive to April 2020, during which time he was receiving LTD benefits under the Plan.  On January 9, 2023, Unum

further calculated a "Net overpayment" for Lehnen of $42,355.64. On January 19, 2023, Unum sent a letter to Lehnen, through his counsel, advising that his last LTD benefit payment of $15,042.94 would be withheld and applied toward the overpayment on his claim, leaving a balance due of $27,312.70.

Although Unum requested repayment within 30 days, Lehnen has not repaid the remaining overpayment due. In addition to seeking reimbursement of the remaining overpayment, plus interest and attorneys' fees, Unum seeks an order requiring plaintiff to provide an accounting of the SSDI benefits he has received and, additionally, an order permitting Unum to deduct the amount of the overpaid benefits from any disability benefits he might be found entitled to receive under the Plan in this lawsuit or in a future disability claim. (Dkt. #21, at ¶¶ 3-5.)

## CONCLUSIONS OF LAW

There are two, primary issues for the court to decide. *First*, the court must decide whether Lehnen was physically disabled and unable to work under the terms of the Plan, such that he is entitled to LTD benefits from July 19, 2022, and forward absent evidence of his disabilities resolving. (Dkt. #17, at 3.) If so, the court must also determine whether he is entitled to interest, attorneys' fees, and costs. *Second*, the court must decide whether Unum is entitled to recover any overpayment of benefits that Lehnen may have received as the result of receiving SSDI benefits retroactive to April 2020, plus interest, attorneys' fees, and costs. The court addresses both issues in turn below.

## I.  The Merits of Lehnen's Claim for LTD Benefits Based on Physical Disability

Lehnen argues that the medical evidence of his physical disability is consistent with his symptoms, which are corroborated by diagnostic and clinical testing.  (Dkt. #17, at 23.)  As noted above, the Plan provides that a participating employee is "disabled" when he is "unable to perform the material and substantial duties of his or her regular occupation."  Thus, the court must first determine the "material and substantial duties" of his "regular occupation," then decide whether he has shown by a preponderance of the evidence that he is unable to perform those duties due to his physical impairments.

### A. Lehnen's Regular Material and Substantial Duties

Lehnen worked remotely from home for Beacon as a Senior Account Executive providing essential EAP services, often under circumstances of extreme urgency that required crisis intervention and management skills.   In that role, Lehnen reported to Beacon's Regional Account Director.   Vocational consultants from Unum, using the enhanced Dictionary of Occupational Titles ("eDOT"),[9] determined that Lehnen's job description met the definition of "Account Executive," which has the following "material and substantial duties" as performed in the national marketplace:

> [C]lient/account management, business growth, customer satisfaction, administrative responsibility for contract management and service provision. Maintaining existing accounts and attracting and developing new accounts are also required.

---

[9] The eDOT is a private resource that is distinct from the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT"), which has not been updated since 1991 (dkt. #15-5, at 135 (AR-001352)), and is considered "outmoded."  *Fetter v. United of Omaha Life Ins. Co.*, No. 20-C-0633, 2021 WL 1842463, at *6 (E.D. Wis. May 7, 2021); *see also Covill v. Unum Life Ins. Co. of Amer.*, 2024 WL 3443916, at *3 (N.D. Iowa July 16, 2024) (noting that, in sharp contrast to the DOT, the eDOT is updated quarterly).

(Dkt. #15-11, at 170 (AR-003176).)  Lehnen's job description states that his position functioned in "a leadership role within Account Services," and that he had an assortment of management responsibilities.  (Dkt. #15-2, at 84 (AR-000383).)  Indeed, during his appeal from the denial of benefits, Unum acknowledged that Lehnen's job as a Senior Account Executive functioned in a leadership role within Account Services and had "management responsibilities that include participation in corporate initiatives, coordination of activities in response to executive management requests and business retention as well as new business development."  (*Id.*)

Regardless, Unum identified the following duties associated with Lehnen's occupation, which are consistent with the evidence provided by plaintiff regarding his occupational requirements:

> Develop and build relationship with members of client participation team, client contacts and leadership contacts.

> Maintain thorough understanding and up-to-date knowledge of financial concepts important for effective underwriting, cost controls and profitability.

> Develop and maintain accurate and comprehensive knowledge of products and services.

> Monitor performance standards and service level agreements.

> Manages and mentors account team members.

> Participates in projects and special projects.

(*Id.* at 171 (AR-003177).)

Comparing Lehnen's executive-level job to the duties of an "Account Director," Unum also identified the following, other material and substantial duties:

> Develops solid relationships with key client contacts of organizations across the nation to learn about projects and opportunities.
>
> Plans, coordinates, and implements marketing plans, and oversees marketing teams who are developing campaigns.
>
> Directs the growth, management, retention and satisfaction of a portfolio of key accounts.
>
> Utilizes and demonstrates marketing ability to lead clients strategically and tactically.
>
> Provides engagement leadership and is regarded by the client as an expert and trusted advisor.
>
> Provides management ability to lead internal teams to prioritize their work and perform at the highest level.

(*Id*.)  Similarly, Lehnen presents evidence that he performed all of these tasks and more while providing EAP crisis intervention services to clients and their employees under extremely stressful conditions.  (Dkt. #15-5, at 138 (AR-001355).)  He also frequently prepared and reviewed reports and contracts.  (*Id*.)

While Unum determined that Lehnen's occupation required only "occasional" keyboarding (Dkt. #15-11, at 171 (AR-003177)), Lehnen disputes this and presents persuasive evidence that his position as a remote worker required "constant" computer use and scrolling.  (Dkt. #17, at 6, 19-20; Dkt. #15-5, at 138 (AR-001355).)  Moreover, his job description for Beacon expressly requires expert level proficiency with Microsoft Word, Excel, and PowerPoint, as well as analytical and problem-solving ability.  (Dkt. #15-2, at 87 (AR-000386).)  Because Unum offers nothing to refute that these competencies are reasonably required of a senior-level executive working remotely by computer from home,

the court includes them as among the material and substantial duties of Lehnen's occupation.

## B.  Lehnen's Evidence of Physical/Cognitive Disability

The administrative record reflects that Lehnen received diagnostic testing and mental health treatment for anxiety and depression, but also for physical medical conditions related primarily to PPPD, chronic pain in his hands and neck, and sleep disorders that contributed to cognitive impairment.  In November 2021, Lehnen reported to Unum that he could not "go back to do his job cognitively," and that he could not "mouse" or "sit and read computer screens."  (Dkt. #15-4, at 280 (AR-001188).)  In January 2022, Lehnen's treating psychiatrist, Dr. McCoy, expressed the opinion that Lehnen's mental health problems were exacerbated by these medical issues, which were by then being treated at the Mayo Clinic.  (Dkt. #15-4, at 264-65 (AR-001172-1173).)  In support of his claim that he is physically and cognitively unable to perform the material and substantial duties of his regular occupation, Lehnen points generally to the following records of evaluations by specialists at the Mayo Clinic regarding his medical conditions and cognitive functioning in July 2020; September 2020; December 2020; March 2021; and November 2021.[10]  (Dkt. #17, at 7.)  Lehnen points in particular to the following evidence in the administrative record, which is alluded to in the factual findings above and

---

[10] Those records are located in the record as follows:  July 2020, dkt. #15-2, at 176-197 (AR-000475-496); September 2020, dkt. #15-2, at 166-172 (AR-000465-474) and dkt. #15-3, at 147-152, 184 (AR-000752-757, 789); December 2020, dkt. #15-3, at 81-147, 183 (AR-000686-752, 758-788); March 2021, dkt. #15-4, at 176-178 (AR-001084-1086); November 2021, dkt. #15-4, at 105-175 (AR-001013-1083).

summarized in more detail below for each condition that Lehnen credibly claims collectively contributed to his physical inability to perform his job-related duties.  (Dkt. #17, at 9-13.)

### 1.  PPPD

After Lehnen stopped working in April 2020, he returned to see Dr. Eggers in July 2020 at the Mayo Clinic Department of Neurology for complaints of vertigo and dizziness.  (Dkt. #15-2, at 181 (AR-000480).)  Dr. Eggers, who had treated Lehnen previously for PPPD in 2016, performed a "detailed ocular motor and vestibular examination" and concluded that Lehnen's "chronic floating dizziness continues to have hallmarks of . . . PPPD, namely visually induced dizziness from scrolling on computer screens."  (*Id*. at 182 (AR-000481).)

An evaluation in July 2020 by a physical therapist with the Department of Otorhinolaryngology diagnosed "dizziness and impaired coordination/balance" due to PPPD.  (*Id*. at 177 (AR-000476).)  When the physical therapist saw Lehnen again in September 2020, he noted that Lehnen's balance had improved but that he continued to have "visual sensitivities."  (*Id*. at 174 (AR-000473).)  Lehnen's symptoms of PPPD improved with physical therapy and home exercises prescribed by Dr. Eggers and the physical therapist.  In November 2021, Lehnen had a "normal Vestibular Exam," although he still had "some visual sensitivities suggestive of PPPD."  (Dkt. #15-4, at 132 (AR-001040).)

In addition to these medical evaluations, Lehnen presents a declaration from his wife, Brenda, who states that Lehnen repeatedly experienced dizziness and nausea triggered

by looking at his computer screens.   (Dkt. #15-5, at 140-41 (AR-001357-1358).)
Although she did not take daily or monthly notes about these occurrences, she documented
several specific instances when Lehnen fell or had difficulty walking because PPPD caused
him to feel nauseated, dizzy, and off-balance.  (*Id*.)

### 2.  Cognitive Impairment

Neuropsychological testing conducted at the Mayo Clinic by Dr. Eva Alden in
December 2020, disclosed that Lehnen's "overall intellectual abilities [fell] in the high
average range."  (Dkt. #15-3, at 147 (AR-000752).)  Even so, testing disclosed "mild
cognitive inefficiency on measures of verbal fluence, as well as memory for semantically
meaningful stories and geometric designs."  (*Id*.)  Dr. Alden concluded that "these subtle
findings" were not due to an underlying degenerative condition, but were "more likely the
cognitive symptoms he experience[d] in his daily life [that were] related to his history of
depression, anxiety, and [PPPD.]"  (*Id*.)  In light of Lehnen's other problems, Dr. Alden
withheld a final diagnosis until his psychometric test results could be integrated with other
diagnostic testing by his referring provider.  (*Id*.)

Lehnen underwent additional neuropsychological testing with Dr. Matthew Powell
at the Mayo Clinic in November 2021.  (Dkt. #15-4, at 115-117 (AR-001023-1025).)
Compared to his 2020 evaluation by Dr. Alden, Dr. Powell concluded that there was "not
compelling evidence to suggest cognitive decline."  (*Id*. at 116 (AR-001024).)  Specifically,
Dr. Powell concluded that Lehnen's cognitive weaknesses were "nonspecific and could be
explained by his known medical problems," including ADD, PPPD, and his psychiatric
history.  (*Id*.)

Lehnen also had a brain MRI at the Mayo Clinic in November 2021, which found "mild generalized age-related cerebral volume loss." (Dkt. #15-4, at 118 (AR-001026).) Dr. Christine Cliatt-Brown concluded that Lehnen's brain was "otherwise normal without evidence of mass lesions or diffusion restriction." (*Id*.) However, she also noted that Lehnen's "hippocampal volumes" were at the 15th percentile for his age, compared with the 36th percentile for age after testing done in September 2020. (*Id*. at 119 (AR-001027).) When discussing the November 2021 test results with Lehnen, Dr. Cliatt-Brown advised that neuropsychological testing disclosed "no clear evidence of decline [when] compared to 2020 and [his] performance in other areas was normal," although one test showed "some mild and patchy hypometabolism without a clear pattern that would be diagnostic of a neurodegenerative disease." (*Id*. at 105 (AR-001013).) Given that the MRI of his brain was "normal with no significant pattern of atrophy," therefore, she concluded that Lehnen did not meet the criteria for mild cognitive impairment. (*Id*.) Dr. Cliatt-Brown similarly found that Lehnen's PPPD, insomnia, and depression may be contributing factors to his cognitive impairments, while acknowledging that "very early neurodegenerative disease [could not] be entirely ruled out." (*Id*.) Therefore, she recommended repeat testing in 12-18 months. (*Id*.) She also recommended that Lehnen enroll in the Mayo Clinic's "NAPS study" as a way to monitor his progression over time, as well as monitoring his sleep disorder.[11] (*Id*.)

---

[11] The NAPS study is a clinical trial by the "North American Prodromal Synucleinopathy (NAPS) Consortium" of persons with Rapid Eye Movement (REM) Sleep Behavior Disorder, otherwise known as RBD. (Tataryn Decl. Ex. 6 (dkt. #19-6) at 2.) Synucleinopathy is a group of neurodegenerative disorders, including multiple system atrophy, Lewy Body Dementia, and

### 3. Hand Pain

As noted above, Lehnen presented records from Dr. Roberts, who treated Lehnen in April 2020 for cervical arthritis and hand stiffness due to arthritis, among other conditions. (Dkt. #15-1, at 290-91 (AR-000289-290).) In December 2020, Lehnen saw Dr. Feyereisn at the Mayo Clinic for joint pain, noting that his hands bothered him the most. (Dkt. #15-3, at 142 (AR-000747).) On December 15, 2020, Lehnen also underwent an electromyogram ("EMG") that was "normal" with "no electrophysiologic evidence of a focal neuropathy, plexopathy, or cervical radiculopathy in either upper extremity." (Dkt. #15-3, at 140 (AR-000745).) X-rays taken the same day showed "[s]light degenerative changes of the wrists," but both hands were "otherwise negative." (Dkt. #15-3, at 183 (AR-000788).)

On December 17, 2020, Dr. Jurrison, an orthopedic surgeon at Mayo Clinic, also examined Lehnen's wrists and hands, observing no significant swelling or deformity. (Dkt. #15-5, at 189 (AR-001406).) While noting that Lehnen's EMG was negative, Dr. Jurrison also noted that "he [did] have provocative maneuvers for carpal tunnel syndrome bilaterally." (*Id*. at 190 (AR-001407).) Accordingly, she suggested soft tissue imaging because bilateral carpal tunnel syndrome can occur in the context of inflammatory arthritis or an "infiltrative disease" in the wrist. (*Id*.)

On December 30, 2020, Lehnen attended outpatient hand therapy for "conservative management of arthritis and possible carpal tunnel syndrome." (Dkt. #15-

Parkinson's disease, that are characterized by the aggregation of *a*-synuclein to form inclusion bodies. Dorland's Medical Dictionary 1827 (33rd ed. 2020).

3, at 92-95 (AR-000697-700).)  In addition to sessions with a therapist, he was measured for arthritis gloves to address his complaints of swelling and stiffness in the morning.  (*Id.* at 94 (AR-000699).)  He was also given therapeutic exercises to perform at home to make his hands stronger and to soothe nerve pain and instructed to use contrast baths, paraffin bath, and a hot pack.  (*Id.*)  Lehnen was further given "resting orthoses" or splints to wear on both hands at night and during the day as needed.  (Dkt. #15-3, at 85 (AR-000690).)

Dr. Jurrison evaluated Lehnen again on March 22, 2022, noting that Lehnen's grip strength had decreased and was "38/38 kg compared to the previous visit when it was 52/54 kg." (Dkt. #15-5, at 265 (AR-001482).)  Still, Dr. Jurrison observed that he did "not have the same provocative maneuvers for carpal tunnel syndrome, other than a positive Phalen on the right after [a] period of time."[12]  (*Id.*)  Dr. Jurrison also noted that he did "have changes in the palm of early Dupuytren's contracture," despite his EMG being "negative or normal."  (*Id.*)  Given that Lehnen described symptoms typical of carpal tunnel syndrome, therefore, Dr. Jurrison thought "it would be reasonable for him to be evaluated by [a] hand surgeon to see if there is a role for surgery either for the carpal tunnel symptoms or the Dupuytren's contracture."  (Dkt. #15-6, at 111(AR-001630).)  She also suggested measuring his typing efficiency and other office work efficiencies in occupational therapy. (*Id.*)

---

[12] The appearance of numbness or paresthesia within 30 to 60 seconds during the "Phalen test" is a positive sign for carpal tunnel syndrome.  Dorland's Illustrated Medical Dictionary 1685 (33rd ed. 2020).

### 4. Neck Pain

In December 2020, Lehnen also underwent diagnostic testing at the Mayo Clinic for complaints of neck pain. An MRI of Lehnen's cervical spine disclosed "mild-to-moderate degrees of multilevel central canal stenosis being most significant at the L4-5 level[.]" (Dkt. #15-3, at 174 (AR-000779).) Worse, cervical imaging by Dr. Mehrsheed Sinaki disclosed "[a]dvanced degenerative arthritis [of the] cervical spine with degenerative disc disease [at] C3-C6 interspaces." (Dkt. #15-3, at 129 (AR-000734).) Further, Dr. Allen Aksamit Jr., a neurologist, reviewed Lehnen's cervical spine x-ray and confirmed that it showed "substantial degenerative disk disease at C3-C6 with mild subluxation and slight cervical scoliosis from degenerative joint disease." (Dkt. #15-3, at 137 (AR-000742).)

On December 23, 2020, Lehnen next saw Gary Kadlec, a certified nurse practitioner ("CNP") at the Mayo Clinic, to follow up on the MRI, which revealed cervical spondylosis, without myelopathy, and axial neck pain. (Dkt. #15-3, at 99-102 (AR-00704-707).) Because physical therapy and oral pain medication had not been beneficial, Lehnen elected to pursue therapeutic bilateral C2-3 facet injections. (*Id*. at 99 (AR0000704).) On December 29, 2020, Lehnen received a cervical spine injection at C2-3 to treat his neck pain. (*Id*. at 87 (AR-000692).)

Lehnen saw CNP Kadlec again at the Mayo Clinic on November 1, 2021, after he complained of worsening neck pain. (Dkt. #15-4, at 153 (AR-001061).) On examination, Kadlec did not detect any "focal weaknesses or upper motor neuron changes," but ordered an updated cervical MRI. (*Id*.) During the appointment, Lehnen asked about repeating

the C2-3 injections because his current neck pain was similar to the pain that responded to those injections the previous year.  (*Id*.)

On November 2, 2021, CNP Kadlec reviewed Lehnen's cervical MRI, which again showed "multilevel degenerative disk and facet changes."  (Dkt. #15-4, at 143 (AR-001051).)    At that time, Kadlec's assessment was "cervical spondylosis without myelopathy."  (*Id*.)  Although Kadlec discussed surgical consultation as an option, Lehnen indicated that he wished to avoid surgical intervention.  (*Id*.)  Kadlec agreed to see Lehnen again in one year for a clinical recheck for any signs or symptoms suggestive of progressive neurologic deterioration.  (*Id*.)  In the meantime, Kadlec discussed "physical therapy, activity modifications, or consideration for repeat therapeutic injections."  (*Id*.)  Lehnen indicated that he would also like to pursue repeat injections, which Kadlec recommended at C2-3 and the C7-T1 facet.  (*Id*. at 143-44 (AR-001051-1052).)

During an examination on May 6, 2022, CPN Kadlec noted that Lehnen had been unable to continue having injections to treat his axial neck pain, which was in the "posterior cervical region," because his insurance provider would not cover this treatment.  (Dkt. #15-5, at 272 (AR-001489).)  Kadlec recommended that Lehnen avoid "prolonged cervical flexion and extension" for more than 3 to 5 minutes.  (*Id*. at 274 (AR-001491).)  Kadlec also recommended that Lehnen avoid prolonged sitting and change positions every 60 minutes, followed by "at least a 30-minute break before resuming . . . use of a computer."  (*Id*.)

### 5. Sleep Disorders

On December 16, 2020, Lehnen also saw Dr. Diego Zaquera Carvalho, a sleep medicine specialist, at the Mayo Clinic. (Dkt. #15-3, at 131-35 (AR-000736-740).) During the day, Lehnen attributed 75% of his impairment to fatigue, both physical and mental, and 25% to sleepiness. (*Id*. at 131 (AR-000736).) Dr. Carvalho concurred with a previous diagnosis of RLS, which likely contributed to chronic insomnia. (*Id*. at 134 (AR-000739).) Dr. Carvalho also thought that Lehnen had symptoms of "sleep disordered breathing" that were "concerning." (*Id*. at 135 (AR-000740).) Dr. Carvalho recommended a "sleep study" to evaluate him for possible obstructive sleep apnea ("OSA"). (*Id*.) Dr. Carvalho also observed some involuntary movements in Lehnen's left hand and decreased arm swing on the left, which could suggest the possibility of "early neurodegenerative process." (*Id*.) Dr. Carvalho further expressed concern that Lehnen's subjective complaints of cognitive decline could be secondary to his depression, anxiety and ADD, but recommended additional testing to determine if he suffered from REM sleep behavior disorder or RBD. (*Id*.)

At a follow-up examination on December 29, 2020, Dr. Carvalho noted that Lehnen's ferritin level was low and ordered an iron infusion. (Dkt. #15-3, at 88 (AR-000693).) Dr. Carvalho also noted that Lehnen was already benefiting from a prescription for Lyrica. (*Id*.) Considering the results of the sleep study, Dr. Carvalho concluded that Lehnen had "[m]ild, positional, mixed obstructive and central sleep apnea." (Dkt. #15-3, at 88-89 (AR-000693-694).) Dr. Carvalho discussed "positional therapy" and recommended an "apnea t-shirt with [a] tennis ball" called the "Slumberbump." (*Id*. at 89

(AR-000694).)  Dr. Carvalho also recommended a device that vibrates every time a patient goes on his back until he moves to the side or a prone position.  (*Id*.)

After this examination, Dr. Carvalho formally diagnosed "idiopathic RBD," and recommended taking Melatonin (10 mg).  (*Id*. at 89-90 (AR-000694-695).)  He also spoke to Lehnen about the risk of developing "different phenotypes of synucleinopathies, in particular[] Parkinson's disease, but potentially Dementia of Lew Body, multiple system atrophy, and less likely, pure autonomic failure."  (*Id*. at 90 (AR-000695).)

At his next visit with Dr. Carvalho, Lehnen reported an improvement with Lyrica, which resolved 90% of his RLS symptoms.  (Dkt. #15-4, at 176 (AR-001084).)  He also reported an improvement with symptoms of RBD after taking 20mg of Melatonin at bedtime.  (*Id*. at 177 (AR-001085).)  Likewise, he reported sleeping with a pillow between his legs, preventing him from turning over in his sleep, which improved the symptoms of OSA.  (*Id*.)  Unfortunately, although Lehnen reported having an easier time falling asleep, he continued to have frequent awakenings, often because of neck pain, with difficulty falling back asleep.  (*Id*. at 176 (AR-001084).)  Dr. Carvalho then prescribed Sonata (10 mg) for nights he had trouble, cautioning Lehnen not to drive for at least four hours after taking that medication.  (*Id*. at 178 (AR-001086).)

Lehnen was seen at the Mayo Clinic again on November 2, 2021, by Dr. Kara Dupuy-McCauley, for complaints related to RLS.  (Dkt. #15-4, at 135 (AR-001043).)  Dr. Dupuy-McCauley noted that his RBD was under good control on 20mg of melatonin nightly.  (*Id*. at 136 (AR-001044).)  She also noted that his chronic pain due to cervical spondylosis was improving due to sleeping in a non-supine position as part of his positional

therapy to remedy OSA. (*Id*. at 135-36 (AR-001043-1044).) Dr. Dupuy-McCauley then increased Lehnen's dosage of pregabalin to address his symptoms of RLS, recommending that he follow-up with Dr. Carvalho or her in a couple of months. (*Id*. at 136 (AR-001044).)

Brenda Lehnen also reported that lack of sleep affected her husband's ability to function and that he had at most three or four "normal" nights of sleep per month in 2022. (Dkt.#15-5, at 139, 141 (AR-001356, 001358).) When Lehnen next saw Dr. Dupuy-McCauley again on July 13, 2022, he reported improvement, but noted that RLS symptoms continued to interfere with his sleep. (Dkt. #15-7, at 274 (AR-002067).) Dr. Dupuy-McCauley determined that Lehnen's RLS, which was the "primary etiology of [his] sleep disturbance," was "not under control" and suggested adjusting his medication regimen. (*Id*. at 275 (AR-002068).)

### C. Physician Opinions And Restrictions

After Unum terminated his LTD benefits in February 2022, based only on mental or behavioral health issues, Lehnen filed an appeal that included opinions from several treating providers supporting restrictions and limitations based on his physical condition. (Dkt. #17, at 14-17.) Specifically, Dr. Feyereisn, who treated Lehnen at Mayo Clinic, completed a Disability Accommodation Request and Medical Statement form on January 15, 2021. Dr. Feyereisn indicated that Lehnen had a physical or mental impairment based on the following conditions:

> Patient has idiopathic REM sleep behavior disorder. He has [PPPD] causing lightheadedness. He has mixed obstructive and central sleep apnea. He does

40

> have [degenerative disc disease] affecting his neck and hands and a history
> of PTSD.

(Dkt. #15-5, at 125-26 (AR-001342-1343).)  When compared to the average person, Dr.
Feyereisn indicated that Lehnen's "[h]igh level executive function" *was* impaired, adding
that this was a "major concern."  (*Id*.)  Dr. Feyereisn explained that the "[l]argest concern
is [Lehnen's] executive performance ability due to his REM sleep behavior disorder that
has an associated correlation with dementia" and was "[s]uspected to worsen with time."
(*Id*.)  Dr. Feyereisn added further that Lehnen's degenerative disc disease made extended
keyboard work a "problem," and that Lehnen's PTSD interfered with his ability to perform
under stress, which was also likely to be impaired.  (*Id*.)  In Dr. Feyereisn's opinion, these
impairments were expected to be "[l]ifelong."  (*Id*.)  While Dr. Feyereisn concluded that
Lehnen could work "in a supervised capacity," his "level of performance of executive
function needs to be observed."  (*Id*.)

Dr. McCoy, who was Lehnen's treating psychiatrist for over 10 years, similarly
opined p that, in addition to his assessment of Lehnen's disabling mental health conditions,
he also observed a decline in Lehnen's mental cognition that would prevent his going back
to his prior occupation,

> Mr. Lehnen has a complex case.  His symptoms are multifactorial with several
> conditions contributing to his disability picture.  I reviewed Mayo Clinic
> records stating he scored 21/30 on the Montreal Cognitive Assessment
> (MOCA).  He had a neuropsychological test[] which showed mild cognitive
> inefficiency on measures of verbal fluency, as well as memory for semantically
> meaningful store[ies] and geometric designs.  Mayo physicians have assessed
> him with cognitive disorder and cognitive decline.  Mayo's assessments are
> consistent with my observations and assessment of him, which include
> Attention Deficit Hyperactivity Disorder, predominantly inattentive type.

(Dkt. #15-5, at 127 (AR-001344).) Noting further that Lehnen was employed "in a high stress, fast-paced environment requiring continuous computer usage for hours at a time using multiple screens in order for him to respond to unfolding crises as well as create the many computer-based reports his employer and clients required," Dr. McCoy asserted that Lehnen was unable to keep up with his job duties due to the following conditions:

> [D]ecreasing cognitive abilities, his [PPPD] visual disturbances making extensive computer usage impossible, his sleep disorders which prevent[] him from getting restful sleep necessary to do his job, and his inability to keep up with the keyboarding demands of his job due to his hand and neck issues.

(*Id*. at 128 (AR-001345).) Accordingly, Dr. McCoy endorsed the same work restrictions recommended articulated by Dr. Feyereisn, concluding that it would be "against [his] strong medical advice for Mr. Lehnen to return to his prior job as a Senior Account Executive." (*Id*.)

In addition, Dr. Jurrison's referral of Lehnen for an Occupational Therapy Assessment for his complaints of soreness, stiffness, and swelling in his hands produced further support for growing physical limitations on his capacity for work, especially under stress during long periods before computer screens. (Dkt. #15-5, at 268 (AR-001485).) During that evaluation on April 7, 2022, Lehnen reported that his ability to type was "significantly" reduced because he found it hard to "feel the keys" on the keyboard and his hands felt increasingly stiff as the day progressed. (*Id*.) Although his grip strength was above average, Lehnen scored below average on the Purdue Pegboard Test with diminished sensation in all of his fingers. (*Id*. at 269 (AR-001486).) On a typing test, Lehnen performed "significantly slower than the average adult who can type at 35-50 [words per minute]." (*Id*. at 270 (AR-001487).) The occupational therapist further noted that

Lehnen could only type with his first three fingers, and he needed to view the keys frequently while moving his neck from flexion to extension to view the keyboard. (*Id.*) The occupational therapist found that Lehnen also had decreased sensation and increased swelling in his right hand after typing only 30 minutes and increased swelling in his left hand after 60 minutes of typing. (*Id.*)

As a result, the occupational therapist recommended that Lehnen rarely type with his right hand and only occasionally type with his left hand. (*Id.*) She further found that Lehnen would need extra time to complete typing tasks and recommended occupational therapy as well as "ergonomic modifications" to enable him to return to work. (*Id.*) Thereafter, on April 8, 2022, Dr. Jurrison provided a letter on Lehnen's behalf, noting that he was undergoing additional evaluation for symptoms of arthritis in his hands that interfere with his ability to type for long periods of time. (Dkt. #15-5, at 129 (AR-001346).) Dr. Jurrison recommended "restricting typing to 20-30 minutes at a time with 10-30 minute breaks in between sessions," although acknowledging that it was possible his condition could improve in the future, depending on a completed evaluation. (*Id.*)

On April 7, 2022, Lehnen also had an orthopedic surgery hand evaluation by Dr. David Dennison, who noted that Lehnen's "x-rays show mild degenerative changes and his previous EMG was basically negative." (Dkt. #15-7, at 239 (AR-002032).) Dr. Dennison recommended additional imaging and a repeat EMG. (*Id.* at 240 (AR-002033).) Depending on whether the results indicated carpal tunnel syndrome, Dr. Dennison thought that Lehnen would also be a good candidate for a trial of corticosteroid injections. (*Id.*)

43

Finally, on April 18, 2022, an EMG of Lehnen's upper extremities was "normal," with no evidence of "right cervical radiculopathy or upper limb mononeuropathy on either side." (Dkt. #15-7, at 254 (AR-002047).) However, an ultrasound of Lehnen's wrists demonstrated "mild fusiform hypoechoic thickening of both median nerves within the carpal tunnels, left greater than right." (*Id.* at 256 (AR-002049).) The reviewing physician determined that these findings were "compatible with carpal tunnel syndrome[.]" (*Id.* at 257 (AR-002050).)

### D. Vocational Expert

In support of his appeal from Unum's denial of continuing LTD benefits, Lehnen also offered an "Independent Employability Assessment" completed by certified rehabilitation counselor, Ken Askew, on July 13, 2022. (Dkt. #15-5, at 130-137 (AR-001347-1354).) Askew reviewed the Plan, Lehnen's job description as a Senior Account Executive with Beacon Health, records from Unum, Lehnen's medical records from Mayo Clinic, and Dr. McCoy. (*Id.* at 130 (AR-001347).) Askew also conducted a "diagnostic interview," observing that Lehnen was "noticeably fatigued" and "visibly tired at the end." (*Id.* at 135 (AR-001352).) (*Id.*) While agreeing with Unum's assessment of the cognitive abilities required to perform Lehnen's position, which required him to "be able to speak and write persuasively to influence other[s] and to make independent judgement and decisions," Askew "strongly disagreed" with the vocational analysis done by Unum that determined Lehnen's job required only "occasional reaching, handling, fingering and keyboard use," as does this court. (*Id.* at 135-36 (AR-001352-53).)

44

Specifically, based on his review of the medical records and his interview with Lehnen, Askew concluded that he was not "physically or mentally capable of working in his previous capacity as a Senior Account Executive." (*Id*.)

> Mr. Lehnen's job required extensive computer work and high cognitive function. The medical records I reviewed state clearly that Mr. Lehnen should not spend significant time keyboarding or scrolling a computer screen. His essential job functions as a Senior Account Executive do not match the restrictions and limitations known to persist from his multifactorial medical status. Mr. Lehnen and his medical providers are noting decreased cognitive function and regular neuropsychological testing will be scheduled. The job description clearly states that a person working as a Senior Account Executive requires expert and proficient knowledge, skill and ability in Microsoft Office and interpersonal skills and written communication skills. The job description also states that the Senior Account Executive must be able to work independently and make sound decisions on accounts. Mr. Lehnen and his medical providers don't feel he can work independently without someone supervising his job performance. Dr. Feyereisn also stated that Mr. Lehnen's job performance may be impaired when he is under stress. Given the high level of stress of his job, the increased stress of a client experiencing a traumatic crisis, and the stress associated with his medical conditions, he is under significant stress most of the day.

(*Id*. at 136-37 (AR-001354-1355).) In Askew's opinion, the job description for Lehnen's work as a Senior Account Executive at Beacon included duties that would normally be performed in the industry in which Lehnen worked as seen in the national economy. (*Id*. at 137 (AR-001355).) Askew added that "in our contemporary labor market the occupation would require frequent keyboarding and continuous computer screen time." (*Id*.) Askew concluded that Lehnen's "employability is below the threshold for disability as defined in the Unum Long Term Disability contract" because he was "not medically or functionally capable of returning to work in his regular occupation[.]" (*Id*.) Although not normally inclined to give vocational opinions great weight, based on the great

preponderance of the medical evidence in this case, the court finds Mr. Askew's opinion fairly compelling here.

### E. Disability Determination

As noted above, the SSA concluded that Lehnen was disabled and awarded benefits retroactive to April 2020, when he became unable to work due to symptoms of PPPD, anxiety, depression, and bilateral hand pain.  (Dkt. #15-7, at 97 (AR-001890).)  Specifically, the SSA determined that Lehnen was disabled primarily as the result of disorders of the skeletal spine.  (*Id.* at 107 (AR-001900).)  The SSA also found that Lehnen suffered from the following other severe medical impairments:  abnormality of major joints in an extremity; carpal tunnel syndrome; and vertiginous syndromes and other disorders of the vestibular system.  (*Id.*)  In addition, the SSA found that Lehnen had severe depression, anxiety, and trauma or stressor disorders.  (*Id.*)

While an SSA finding of disability can be evidence that a claimant is disabled, it is not entitled to dispositive weight and is not binding on employers under ERISA.  *See Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 772-73 (7th Cir. 2010) (noting that a plan "is not forever bound by a Social Security determination of disability"); *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 398 (7th Cir. 2009) (the Seventh Circuit has "repeatedly emphasized that the SSA's determination of disability is not binding on employers under ERISA").  Even so, in making its own, independent assessment, the court finds the SSA's decision persuasive because the disability determination is bolstered by additional evidence presented by Lehnen.  Notably, the SSA determined that Lehnen was totally disabled without even considering:  the Occupational Therapy Assessment that

evaluated his functional capacity and typing ability on April 7, 2022; the letters from three treating physicians who recommended restrictions (Dr. Feyereisn, Dr. Jurrison, and Dr. McCoy); the restrictions recommended by CNP Kadlec in May 2022; or the expert vocational report from Askew on July 13, 2022.  (Dkt. #15-7, at 92 (AR-001885).)  In particular, the Occupational Therapy Assessment, which included functional capacity testing of Lehnen's hands, recommended that he be restricted from typing and rarely use his right hand to type.  (Dkt. #15-5, at 270 (AR-001489).)  The observations made by the occupational therapist about Lehnen's typing posture, and the likelihood that it contributed to his neck and hand pain, are also consistent with those made by CNP Kadlec, who recommended that Lehnen avoid prolonged extension of his neck for more than 3 to 5 minutes.  As a functional capacity evaluation,[13] the Occupational Therapy Assessment is also objective evidence of the severity of Lehnen's limitations, which are directly related to his ability to sit for prolonged periods and work on a computer with multiple monitors for eight hours per day, one of the main requirements of his job.  *Holmstrom*, 615 F.3d at 770.

Moreover, Unum has offered no reason to discredit the opinions by Dr. Feyereisn or vocational expert Askew that Lehnen's physical ability to perform his executive-level occupation independently, which required constant computer use under extremely stressful and often emergent conditions, was impaired by advanced degenerative arthritis and severe degenerative disc disease of the cervical spine.  Those opinions are also supported by x-rays and imaging in medical records from evaluations at the Mayo Clinic dating back to

---

[13] A "functional capacity examination consists of a battery of tests to assess a patient's current physical and functional abilities and potential to return to work."  *Marantz v. Permanente Med. Group, Inc. Long Term Disability Plan*, 687 F.3d 320, 331 (7th Cir. 2012).

December 2020.  (Dkt. #15-3, at 129 (AR-000734), 137 (AR-000742), 174 (AR-000779); Dkt. #15-4, at 143 (AR-001051).)   While Unum's consulting physician, Dr. Norris, concluded Lehnen's neck pain was successfully treated with injections, the medical records from Mayo Clinic show that Lehnen was unable to continue receiving those injections because they were not covered by his insurance, meaning his symptoms needed to be managed by activity modification, including the restrictions recommended by CNP Kadlec.  (Dkt. #15-5, at 272, 274 (AR-001489, 1491).)   Unum provides no basis to discredit this evidence of Lehnen's physical impairment, which in Kadlec's opinion precludes him from prolonged sitting or computer work without a thirty-minute break every hour, which also precludes his return to his past position with Beacon.  (*Id*. at 274 (AR-001491).)   Similarly, Dr. Feyereisn concluded that Lehnen's degenerative disk disease interfered with his ability to use a computer, meaning he could not work unsupervised or independently due to his reduced executive function.  (*Id*. at 126 (AR-001343).)

Finally, beyond the evidence of Lehnen's significant physical impairments, the court is required to consider how those impairments affect Lehnen's cognitive ability to perform his occupation.  *See Scanlon v. Life Ins. Co. of N. Am*., 81 F.4th 672, 680 (7th Cir. 2023) ("[T]he district court must specifically address [the claimant's] ability to perform the cognitive aspects of his job with the limitations identified in the record.").  Lehnen's wife Brenda also credibly reports that by the Spring of 2019, his physical impairments from PPPD, degenerative disk disease, deteriorating hands, and sleep disorders were causing him to struggle to "keep up cognitively" with the demands of his job, which in turn caused anxiety about his job performance in an already inherently stressful position.  (Dkt. #15-

48

5, at 138 (AR-001355).)  In addition to memory issues, she provided numerous, specific examples of how the constant computer usage required for his work caused him to become dizzy and nauseous, including instances in which he fell as a result of these symptoms and others in which he was afraid to drive.  (*Id*. at 139-141 (AR-001356-1358).)

Although there is mixed medical evidence of the extent of Lehnen's present cognitive impairment, Dr. Cliatt-Brown considered his symptoms in connection with his other medical issues and could not rule out that he was experiencing very early neurodegenerative disease, such as Lewy Body Dementia, prompting her to enroll him in a clinical trial to monitor his progression alongside his sleep disorder, which has a correlation with dementia.  (Dkt. #15-4, at 105 (AR-001013).)  None of Unum's consultants acknowledged the evaluation by Dr. Cliatt-Brown or the link between sleep disorders that can signal neurodegenerative disorders, including Parkinson's disease, Lewy Body Dementia, or other forms of cognitive impairment.  (Tataryn Decl. Ex. 7 (dkt. #19-7) at 2.)  Similarly, none of Unum's consultants acknowledged the evaluations by Dr. Carvalho or Dr. Dupuy-McCauley regarding Lehnen's chronic RLS, which required increasing amounts of medication to address and, as of 2022, remained uncontrolled. (Dkt. #15-7, at 274-75 (AR-002067-2068).)  As both Dr. Feyereisn and Askew observed, however, Lehnen's sleep disorders are a medical condition also affecting his ability to perform at a high level under significant, sustained stress.  (Dkt. #15-5, at 126, 134 (AR-001343, AR-001351).)

Dr. McCoy, who treated Lehnen for more than ten years, also observed symptoms of cognitive decline that were made worse by Lehnen's multiple medical issues.  (Dkt. #15-

5, at 127 (AR-001344).)  It is true that an ERISA plan administrator is not required to afford a treating physician's opinion with special deference when making a disability determination.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003).  At the same time, none of Unum's medical or psychiatric consultants who reviewed Lehnen's records ever examined him and their opinions are discounted for that reason.  Dr. Norris, in particular, found that Lehnen's recurrent symptoms of PPPD, which were exacerbated by constant scrolling on multiple computer screens, were unsupported because Lehnen could reportedly still ride a bicycle, while Dr. Norris includes no reference to medical records in support of this purported ability.  (Dkt. #15-6, at 49 (AR-001568).)  To the contrary, Lehnen acknowledged during his lengthy, in-person diagnostic interview with Askew that he previously enjoyed competitive cycling, but had been unable to do much bike riding at all over the past several years because his hands and neck caused him problems while biking and also could trigger his PPPD symptoms.  (Dkt. #15-5, at 135 (AR-001352).)

Both the report from Dr. Norris and Unum's psychiatric consultant, Dr. Brown, also conveniently and selectively ignore objective test results from specialists at Mayo Clinic who treated Lehnen repeatedly for his complaints of pain and cognitive impairment, whether from possible early dementia or from exhaustion as the result of his assortment of sleep disorders.  In this court's view, Lehnen's repeated reports of pain and cognitive difficulties, made and credited during multiple comprehensive evaluations by specialists while pursuing treatment at the Mayo Clinic, are persuasive evidence of the symptoms he was experiencing, whether or not substantiated by objective test results.  *See Holmstrom*,

615 F.3d at 761 (noting the difficulty presented by claims for disability insurance by people with serious and painful conditions that do not have objectively measurable symptoms). During those visits, Lehnen consistently described how his medical conditions caused significant functional limitations that frustrated his ability to work as a Senior Account Executive providing crisis management for clients' employees via constant computer usage. Thus, Lehnen's self-reports are significant and probative evidence of his inability to perform the material and substantial duties of his occupation, as described above. *Cf. Diaz*, 499 F.3d at 646 (claimant's pursuit of extensive treatment including heavy medication and repeated surgical procedures "supports an inference that his pain, though hard to explain by reference to physical symptoms, was disabling").

Taking the entire administrative record into account, the court holds that Lehnen has shown by a preponderance of the evidence that due to his physical impairments, including their impact on his ability to function cognitively at a high level under stressful conditions, he is unable to perform the material and substantial duties of his regular, past occupation and, therefore, has been disabled under the Plan's definition since before his LTD benefits were terminated on July 18, 2022. Accordingly, Lehnen is entitled to a judgment in his favor and is entitled to continuing LTD benefits. As requested by Lehnen, the court will award Lehnen retroactive monthly benefits under the Plan dating back to July 19, 2022. (Dkt. #1, at 24.) Unum will be directed to reinstate his claim and commence monthly benefits going forward from the date of judgment according to the terms of the Plan, as long as he remains eligible for his physical limitations as discussed in this opinion. (*Id*. at 25.)

### F. Interest, Attorneys' Fees, and Costs

Lehnen also seeks an award of interest. There is a "presumption in favor of prejudgment interest awards" for ERISA cases. *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002) (internal quotation marks omitted). Whether to award an ERISA plaintiff prejudgment interest is "a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." *Id*. The court concludes that an award of prejudgment interest is appropriate here. Because ERISA contains no statutory prejudgment interest rate, the Seventh Circuit suggests using the prime rate for fixing prejudgment interest. *Id*. The average of the monthly prime rates from July 2022 (when Unum stopped paying benefits) through February 2026 is 7.47%. Accordingly, the court concludes that Lehnen is also entitled to prejudgment interest calculated at this rate on the retroactive monthly benefits that he is owed under the Plan.

Lehnen further seeks attorneys' fees and costs under ERISA, which "allows a court, in its discretion, to award 'a reasonable attorney fee and costs of action to either party.'" *Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. Coll. of Wis., Inc.*, 657 F.3d 496, 505 (7th Cir. 2011) (quoting 29 U.S.C. § 1132(g)(1)). In making a determination about attorneys' fees under ERISA, the court must ask whether the losing party's position was "substantially justified and taken in good faith, or was that party simply out to harass its opponent?" *Id*. at 506 (internal quotations omitted). Because neither party has provided briefing on this issue, the court reserves ruling on Lehnen's request for attorneys' fees and costs. Lehnen may file a separate motion for attorneys' fees and costs within 30 days of the date of this order, supported by the lawyer's invoices and billing records. Defendant

may file an opposition 21 days thereafter, with a similar production of its lawyers' invoices and billing records.

## II.  Unum's Counterclaim for Overpayment of Benefits

As noted, Unum has also filed a counterclaim under ERISA § 502(a)(3), codified as amended at 29 U.S.C. § 1132(a)(3), which allows a fiduciary to bring an action to obtain "appropriate equitable relief . . . to enforce any provisions of this subchapter or the terms of the plan[.]"  This provision authorizes only "those categories of relief that were *typically* available in equity."  *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 361 (2006) (emphasis in original).  Such relief includes equitable liens on "particular funds or property in the defendant's possession."  *Id.* at 362 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002)).  By contrast, an action against the general assets of the participant is a legal action to impose personal liability, which is not authorized under § 1132(a)(3).  *Id.* at 363.

Lehnen does not dispute receiving an overpayment of $27,312.70 in LTD benefits under the Plan after he received an award of SSDI benefits retroactive to April 2020. Lehnen also does not dispute that he has not repaid this amount despite expressly agreeing to do so when he signed the Benefit Payment Option Agreement, which authorizes Unum to seek "appropriate equitable relief," including equitable restitution and an equitable lien by agreement.  (Dkt. #11-1, at 1.)  An equitable lien by agreement is a type of equitable lien created by an agreement to convey a particular fund to another party.  *Montanile v. Bd. of Trustees of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 143 (2016).  In an ERISA case, a claim to enforce such a lien is equitable because the benefit plan "could rely

on a familiar rule of equity to collect -- specifically, the rule that a contract to convey a specific object even before it is acquitted will make the contractor a trustee." *Id*. (internal quotation marks and alteration omitted).  Thus, under the terms of the plan and principles of contract law, Lehnen is obligated to reimburse Unum for any overpayment of benefits. *Central States, Se. & Sw. Areas Health & Welfare Fund*, 966 F.3d 655, 658 (7th Cir. 2020).

Lehnen argues creatively, if unsuccessfully, that Unum is not entitled to equitable relief here because it cannot prove that the funds remain in his possession and cannot, therefore, attach a lien.  (Dkt. #17, at 24-25.)  In support, Lehnen provides a declaration explaining that he received no funds from Unum after February 2022, and had to use his SSDI benefits to pay living expenses and legal fees.  (Dkt. #18.)  He argues, therefore, that the funds he received from Social Security have been dissipated and cannot be identified with particularity for purposes of a lien.  (Dkt. #17, at 25.)

Addressing the dissipation of settlement proceeds by an ERISA plan participant, the U.S. Supreme Court has held that if the sought-after funds have been entirely dissipated, the viability of an equitable lien depends on whether the original funds can be traced to particular items.  *Montanile*, 577 U.S. at 139.  If so, then a constructive trust would continue to operate against the items bought with the proceeds.  *Id*.  If not, however, and the proceeds have been entirely dissipated on nontraceable items, the equitable lien is eliminated.  *Id*.  This is because any further action to collect on the proceeds would be legal, not equitable, in nature once the lien has been eliminated, and in that event, § 1132(a)(3) would no longer authorize an action to recover, as it is explicitly limited to "equitable relief."  *Id*. at 145-46.  As the Supreme Court explained, equity depends on the

54

principle that the court can "lay hold of" the property, and if the property is gone (without being replaced by identifiable assets), no equitable remedy remains. *Id*. This rule applies to equitable liens by agreement, as well as other types of equitable liens. *Id*. at 146.

Unum argues that Lehnen's defense of dissipation should be disregarded because, by signing the Benefit Payment Option Agreement, he not only agreed to reimburse Unum for any overpayment of benefits, but he also waived any legal or equitable defenses to Unum's right to enforce the terms of that Agreement. (Dkt. #11-1, at 1; Dkt. #24, at 40.) Unum notes further that Lehnen failed to plead any defenses, and has forfeited his dissipation defense as a result.[14] (Dkt. #24, at 40.)

Even assuming that Lehnen's waiver is operable -- and Lehnen advances no reason it should not be -- or that, as Unum claims, he has forfeited this defense, it appears to make little difference in this case. Irrespective of the existence of any funds received from SSDI, the Benefit Payment Option Agreement grants Unum the right to impose a lien on any "real or personal property in an amount equal to the overpayment." (Dkt #11-1, at 1.) Likewise, Unum may recover the overpayment by suspending further payment of benefits. *Northcutt v. General Motors Hourly-Rate Employees Pension Plan*, 467 F.3d 1031, 1037-38 (7th Cir. 2006). Specifically, the Benefit Payment Option Agreement that Lehnen signed as a condition for receiving unreduced benefits expressly allows Unum to recoup any overpayment from "future disability payments," including any minimum benefit owed

---

[14] A defendant's failure to plead an affirmative defense may result in waiver or forfeiture if the defendant merely failed to preserve the defense by pleading it. *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 478 (7th Cir. 2019). However, Unum does not establish that dissipation of funds qualifies as an affirmative defense that must be pled. *See* Fed. R. Civ. P. 8(c) (listing affirmative defenses).

under the Plan. (Dkt. #11-1, at 1.)  Indeed, Unum has already withheld LTD benefit payments previously owed to Lehnen as a means to recover a portion of the overpayment that resulted from his retroactive award of SSDI benefits.  And the Seventh Circuit has approved such a practice, explaining that doing so "fosters the integrity of a written plan and ensures the availability of funds for other participants."  *Northcutt*, 467 F.3d at 1038.

Because the court has found that Lehnen is eligible to receive additional LTD benefits and that Unum is allowed to recover any overpayment from those benefits, the court will grant Unum's request for an accounting to determine the amount of SSDI benefits received by Lehnen while covered by the Plan and not yet recouped.  The court will also enter an order authorizing Unum to set off or withhold disability benefits to recover any overpayment under the Plan, which Lehnen expressly agreed to repay out of those proceeds under the Benefit Payment Option Agreement.  (Dkt. #11-1, at 1.)

Unum has requested interest on the amount of overpayment that it is entitled to recover, but does not provide information about the amount or the applicable interest rate. Nor is there adequate briefing on the availability of attorneys' fees and costs, which Unum is entitled to recover under the terms of the Benefit Payment Option Agreement.  (Dkt. #11-1, at 1.)   As with Lehnen's request for attorneys' fees and costs, the court reserves ruling on these issues.  Once an accounting of Lehnen's SSDI funds has been completed, Unum may file a separate motion within 30 days, regarding the amount of overpayment owed plus interest, and demonstrating its entitlement to attorneys' fees and costs, with plaintiff having 21 days to file any opposition.

ORDER

IT IS ORDERED that:

1) Plaintiff Kent A. Lehnen's motion for judgment on the pleadings (dkt #16) is GRANTED in part as to his claim for long-term disability benefits and DENIED in remaining part.

2) Defendant Unum Life Insurance Company of America shall pay long-term disability benefits under the terms of the Plan retroactive to July 19, 2022, plus interest at a rate of 7.47%, and going forward as long as Lehnen remains eligible consistent with this opinion.

3) Plaintiff Lehnen shall file a separate motion for attorneys' fees and costs within 30 days of the date of this order, with defendant Unum's opposition due 21 days later, provided that both sides produce their lawyers' invoices and billing records with that side's filing.

4) Defendant Unum's motion for judgment (dkt. #21) is also GRANTED, in part, as to its counterclaim for recovery of an overpayment of SSDI benefits that plaintiff Lehnen has received from the Social Security Administration, and DENIED in remaining part.

5) Defendant Unum may set off or withhold long-term disability benefits still due under the Plan based on plaintiff Lehnen's receipt of SSDI benefits.

6) Defendant Unum's request for an accounting of SSDI benefits received by plaintiff Lehnen to date for purposes of determining the offset of long-term disability benefits is GRANTED.  Plaintiff Lehnen shall provide an accounting of those benefits to Unum within 30 days of the date of this order.

7) Within 30 days after the accounting of plaintiff Lehnen's SSDI benefits has been completed, defendant Unum shall file a separate motion regarding the amount of overpayment owed, plus interest at the applicable rate, and supporting its request for attorneys' fees and costs, with plaintiff Lehnen's opposition, if any, due 21 days later.

Entered this 17th day of February, 2026.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

57